# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CATHERINE R. LANGLEY-GUCCIONE,**

        **Plaintiff,**

**-vs-**                                    **Case No.  6:04-cv-1721-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Catherine R. Langley-Guccione  ["Langley-Guccione"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for childhood disability benefits and supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED** to the Commissioner for further proceedings.

## I.    PROCEDURAL HISTORY

On June 25, 2001, Langley-Guccione filed a claim for childhood disability benefits and supplemental security income benefits, claiming disability as of September 28, 2000 due to organic brain damage, depression, memory loss, headaches, loss of balance, and back and neck pain.  R. 65-67, 106, 271-73.  Her claims were denied initially, R. 59, and upon reconsideration, R. 56.  On September 30, 2003, the Honorable Albert D. Tutera, Administrative Law Judge ["ALJ"], held a twenty-minute hearing on Langley-Guccione's claim in Melbourne, Florida. R. 32 - 46. Non-attorney

Jim Moore represented Langley-Guccione at the hearing.  R. 32.  The ALJ heard testimony from Langley-Guccione.  R. 33.

On April 27, 2004, the ALJ issued a decision that Langley-Guccione was not disabled and not entitled to benefits.  R. 18-26.  Following a review of the medical and other record evidence, the ALJ found that Langley-Guccione retained the residual functional capacity ["RFC"] to lift and carry less ten pounds frequently and twenty-five pounds occasionally; to stand, walk, sit, push, and pull without restriction; and to climb, balance, kneel, crouch, crawl, stoop, and speak occasionally.  R. 25, Finding 6.  The ALJ also found that Langley-Guccione should also avoid working at heights or around dangerous machinery.  *Id.*  The ALJ found that Langley-Guccione could perform her past relevant work as a pizza restaurant worker, as that job did not require the performance of work-related activities precluded by her RFC.  R. 25, Finding 7.  As Langley-Guccione's medically determinable impairments did not prevent her from performing her past relevant work, the ALJ found that Langley-Guccione was not disabled.[1]  R. 25, Finding 8.

As Langley-Guccione also applied for childhood disability benefits, the ALJ considered the additional issues of whether Langley-Guccione is the child of a wage earner, unmarried, dependent on the wage earner, and under a disability that began prior to her reaching age twenty-two.  R. 18-19. The ALJ found that, as Langley-Guccione testified (during the hearing) that she was married one year before the hearing date and had made no showing that her husband was entitled to disability benefits,

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

Langley-Guccione's eligibility for chilhood disability benefits ended the month before she was married. R. 18-19, 25, Finding 1. In his decision, the ALJ also found that Langley-Guccione was not entitled to childhood disability benefits. R. 26.

After considering additional medical records and reports, R. 6, 10, the Appeals Council denied review. R. 6. On November 29, 2004, Langley-Guccione timely appealed the Appeals Council's decision to the United States District Court. Docket No. 1 at 1. On April 29, 2005, Langley-Guccione filed in this Court a memorandum of law in support of her appeal. Docket No. 9. On July 1, 2005, the Commissioner filed a memorandum in support of her decision that Langley-Guccione was not disabled. Docket No. 10. The appeal is ripe for determination.

## II.    **THE PARTIES' POSITIONS**

Langley-Guccione assigns three errors to the Commissioner. First, Langley-Guccione claims that the Commissioner erred in according "little weight" to the opinions of treating physician Dr. Fred J. Petrilla. Docket No. 9 at 12. Second, Langley-Guccione contends that the Commissioner erred by failing to adequately address how Langley-Guccione's mental limitations eroded her capacity to perform unskilled work. *Id.* at 15. Third, Langley-Guccione alleges that the Commissioner erred by failing to assign weight to and properly consider the opinion of Dr. Walter Afield.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner counters that the ALJ properly considered and weighed all medical source opinions, including those of Dr. Petrilla and Dr. Afield. Docket No. 10 at 5, 11. Second, the Commissioner argues that substantial evidence supports the ALJ's finding that Langley-Guccione had the mental RFC to perform unskilled work. *Id.* at 14.

### III.   THE STANDARD OF REVIEW

#### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

#### B.   REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon*

*v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir.

1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and*

*Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner

if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a

sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does

not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

### D.     STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Langley-Guccione

submitted additional medical records and reports covering from February 2, 2001 through June 1,

2004. R. 10.[3] If a claimant submits evidence that does not relate to the relevant period under

consideration, "the Appeals Council will return the additional evidence to [the claimant] with an

explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his

or her] right to file a new application." 20 C.F.R. § 404.976(b)(1)(2005). The Appeals Council did

not return the additional evidence to the claimant. Rather, the Appeals Council properly made the

evidence a part of the record, and also considered the evidence in denying review. R. 6, 10. The

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

[3]Langley-Guccione also submitted "contentions of representative" dated August 23, 2004, but no new evidence past June 1, 2004. R. 10.

district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g). Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review, the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g). *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g). The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. 20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc). The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's review is similarly broad. *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000). The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues. *Sims*, 120 S.Ct. at 2086. When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086; *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th

Cir. 1994). Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review. *Keeton*, 21 F.3d at 1066. Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998). When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him). Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit. In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review. Instead he appealed only the *ALJ's decision* to deny benefits. 150 F.3d at 1324. In this case, although Langley-Guccione does not expressly state that she is appealing from the Appeals Council's decision, she does seek reversal of the Commissioner's final decision, which is the Appeals Council's decision to deny review. Docket No. 1 at 2; *see also* Docket No. 9 at 2. The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review. *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies.  The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence.  The Appeals Council's determination is subject to

judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086;  *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

**B.    THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.

-12-

42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the

-13-

physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and

-17-

laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

## F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional

-19-

areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

-20-

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent

to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

-22-

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.      APPLICATION AND ANALYSIS

### A.      THE FACTS

Langley-Guccione was born on October 24, 1979.  R 65.  Langley-Guccione was twenty-three years old on September 30, 2003, the day of the hearing.  R. 32.  She completed high school (R 112), and some secondary schooling at Brevard Community College (R. 172-73, 146).  She has past relevant work as a restaurant worker in a pizzeria, answering phones and cooking pizzas.  R. 25, Finding 7, 93, 107.  She also worked for a hospital as a transporter, transporting patients.  R. 93, 95.

On September 28, 2000 (the alleged on-set date of disability), Langley-Guccione was driving about ten to fifteen miles an hour in the Brevard Community College campus parking lot, when the front of her car hit the side of another car, resulting in minor damage to the front of her car.  R. 127, 129, 146.  Langley-Guccione was wearing her seatbelt, but hit the front of her head on the windshield.  R. 169.  Langley-Guccione was taken by ambulance to the Wuesthoff Memorial Hospital emergency room with complaints of mild head and neck pain and a mild headache.  R 127.  X-rays of Langley-

Guccione's cervical spine were normal.  R. 116.  The doctor recommended ice, ibuprofen, and a muscle relaxant, and discharged her.  R. 121.

On November 29, 200, Gregory C. Priest (a doctor of chiropractics) saw Langley-Guccione who complained of neck, shoulder, intermittent bilateral thigh, and mid and low back pain and headaches.  R. 169.  Langley-Guccione reported that her pain increased shortly after her discharge from the hospital.  *Id.*  She also reported seeing her family physician who recommended exercises but no other treatment.  *Id.*  Her gait and stance were normal, and her upper and lower motor, sensory, and reflex functions were intact.  R. 170.  Dr. Priest's palpations revealed cervical, thoracic and lumbar paraspinal spasms; tenderness in the suboccipital region bilaterally; and restriction in the midcervical, midthoracic and bilateral sacroiliac regions.  *Id.*  Her active cervical and lumbar ranges of motion were limited, and straight leg raise produced low back pain.  *Id.*  Dr. Priest diagnosed possible closed head injury with cerebral concussion and post-traumatic headaches; post-traumatic cervical sprain with associated cervical segmental dysfunction; post-traumatic lumbosacral sprain with possible lumbar disc herniation and radiculopathy; and post-traumatic thoracic sprain.  R 171.  He did not review or order any x-rays.  *Id.*  Dr. Priest recommended moist heat, stretching exercises, and a cervical pillow. *Id.*  He also scheduled Langley-Guccione for a cervical and lumbar evaluation and a neurological evaluation.  *Id.*

As recommended by Dr. Priest, Langley-Guccione saw neurologist Christopher Prusinski on December 5, 2000 for a neurological evaluation.   R. 146.   Langley-Guccione complained of experiencing constant neck pain since the car accident.  *Id.*  She further reported that her weaker grip strength caused her to "drop things often."  *Id.*  Langley-Guccione reported constant mid back pain

with radiation to the anterior chest wall. She also had intermittent low back pain with radiation to the lower extremities to her knees, and numbness and tingling of the feet. R. 146-47. She also complained of daily, frontal and sub-occipital headaches with sensitivity to light and blurred vision. R. 147.

Dr. Prusinski saw no evidence of thought or mood disorder, and noted that Langley-Guccione's speech was normal. *Id.* He also noted that her head was atraumatic and that her head and eyes were normal. R. 147-48. Dr. Prusinski's examination noted diminished fine touch and pin prick sensation at -1/4 in a left C5 and C6, left L5 and S1 and -2/4 in a bilateral median distribution. R 148. Langley-Guccione also displayed bilateral thumb abductor weakness, bilateral suboccipital tenderness with palpation, and restrictions with left side bending and rotation. *Id.* Passive range of motion testing in the lumbar spine revealed restrictions at -1/4 with right and left side bending and rotation, flexion and extension. R 149.

Dr. Prusinski's palpations also displayed bilateral cervical, thoracic and lumbar paraspinal muscles spasm. *Id.* Dr. Prusinski diagnosed: closed head injury with cerebral concussion; post-concussion syndrome; post-traumatic bilateral greater occipital neuralgia with secondary cephalgia (headaches); post-traumatic cervical, thoracic, and lumbar sprain; and bilateral carpal tunnel syndrome. *Id.* Dr. Prusinski recommended application of moist heat or cold, continued chiropractic treatment (with Dr. Priest), and that a magnetic resonance image (MRI) be taken of the spine. *Id.* The doctor also prescribed Lodine (an anti-inflammatory medication) and Esgic Plus (an analgesic pain reliever). *Id.*

MRI's taken on December 14, 2000 were mainly normal.  R. 143-45.  An MRI of her cervical spine was normal, revealing only minimal degenerative changes of slight disc desiccation within the proximal cervical region and mild straightening of the normal cervical lordosis.  R 145.  An MRI of her thoracic spine revealed small central disc herniation at 3-4 and T7-8 with effacement of the subarachnoid space at these levels and mild degenerative changes consisting of slight desiccation and slight annular bulging (R 144), and an MRI of her lumbosacral spine showed mild degenerative changes with annular bulging without neurologic compromise (R 143).

On December 19, 2000, Langley-Guccione visited Dr. Prusinski with complaints of sub-occipital headaches, nosebleeds, neck pain with numbness and tingling of the hands, mid and low back pain with radiation to the lower extremities bilaterally, numbness and tingling of the feet, and "shakiness."  R 139.  She was still attending school, and receiving chiropractic treatment.  *Id.*  Dr. Prusinski recommended that she continue her chiropractic treatment (with Dr. Priest) and prescribed Elavil.  *Id.*  Dr. Prusinski also ordered electromyographies (EMG's) and nerve conduction studies (NCS's) of Langley-Guccione's upper and lower extremities. The lower extremity EMG and NCS (dated December 19, 2000) were normal. R. 142.  The EMG and NCS of the upper extremities (dated January 22, 2001) revealed some abnormalities: increased insertional activity in the left hand muscles and bilateral carpal tunnel syndrome that was moderate in severity. R. 136.

Langley-Guccione returned to Dr. Prusinski on January 22, 2001 with similar complaints of pain and headaches, and reported having difficult with her memory. R. 135.  Dr. Prusinski noted no interval changes in examination findings, and recommended continued chiropractic treatment with Dr. Priest and use of wrist splints at night.  He also advised Langley-Guccione against using her hands

repetitively.  *Id.*  On February 6, 2001, Dr. Prusinski saw Langley-Guccione, and again, reported no interval change in her condition.  R. 134.  The doctor repeated previous recommendations and prescribed Maxalt (migraine medication).  *Id.*

An MRI of the brain dated February 21, 2001 showed normal results, except for mild dilation of the spinal column.  R 133.  On February 26, 2001, Langley-Guccione visited Dr. Prusinski, and reported continued pain and headaches with blurry vision.  R 132.  Dr. Prusinski found no changes, and recommended an opthmalogy evaluation and treatment.  *Id.*  Langley-Guccione returned to Dr. Prusinski on April 4, 2001, and again reported memory problems and continued headaches, neck pain, numbness, tingling and weakness of the bilateral upper extremities and hands, mid and low back pain and pain to her abdomen.  R 131.  Dr. Prusinski prescribed Elavil and Esgic Plus, and recommended psychometric testing.  *Id.*

From February 2, 2001 until April 11, 2001, Langley-Guccione received regular massage therapy.  R 303-316.  The massage therapist's notes indicate that Langley-Guccione reported a variety of problems, including blurry vision, soreness near her armpits and rib cage, headaches, and neck, back, and shoulder pain.  *Id.*  On March 6, 2001, Langley-Guccione complained of mid-back pain and of having headaches earlier "but not now."  R. 311.  A week later, she informed the therapist that she was taking pain medication for rectal tissue surgery, and that she did not "feel much pain anywhere."  R. 310.  On March 28, 2001, she stated that her headaches were "real[ly] bad."  R. 308.  The following day, Langley-Guccione's shoulders were sore, but her back was "improving."  R. 307.  In early April 2001, the therapist noted that Langley-Guccione was possibly pregnant due to her complaints of

tenderness and other symptoms.  R. 305-03.  On her final visit, Langley-Guccione reported that she was "pretty good today."  R. 303.

Throughout this time, Langley-Guccione also received frequent chiropractic treatment from Dr. Priest.  R 153-168.  Her weekly visits began in November 2000 and continued until Dr. Priest's final evaluation on April 18, 2001.  *Id.*  For the majority of Langley-Guccione's visits, Dr. Priest reported improvement (of her headaches or pain symptoms) and positive response to treatment R. 153, 157, 158, 161, 163, 164, 166, 167.  On January 8, 2001, Dr. Priest suggested that Langley-Guccione should not: lift over 30 pounds; do prolonged overhead work; do prolonged or repetitive bending or turning of the neck and waist; and sit, stand, or walk for a prolonged period of time. R. 156, 162. During Dr. Priest's final evaluation, Langley-Guccione reported that she had "significant improvement relative to the frequency, severity, and duration of her pain," but that her daily activities were still diminished.  R. 153.  Dr. Priest noted that her gait and stance were normal; that her upper and lower extremity functions were intact; and that a straight leg raise did not produce radiculopathic symptoms. *Id.*

On April 19, 2001, Dr. Walter Afield conducted a neuropsychiatric evaluation.  R. 175. Langley-Guccione complained of headaches, pain, and memory loss. R. 176.  She was still a full-time nursing student at Brevard Community College, but she was having more trouble understanding school and needed more time to complete her exams since her accident.  *Id.*  Dr. Afield's impression was that Langley-Guccione had: post concussion syndrome (with "suspected" brain damage); post-traumatic headaches; post-traumatic vision impairment in her left eye; cervical strain or sprain (ruling out radiculopathy); lumbosacral strain or sprain (ruling out radiculopathy); anxiety with depression;

and post-traumatic disorder.  R. 179.  Dr. Afield's physical examination revealed normal results.  R. 177-79.  Her head, eyes, and motor and sensory systems were all normal.  R. 177-78.  She had normal gait and posture, and normal upper and lower extremities.  R. 178.  While she reported pain in her cervical spine, she showed no limited range of motion.  *Id.*  She reported "mild" discomfort in the paraspinal muscles and on examination of the lumbar spine.  R. 179.  Straight leg raising produced pain at more than forty-five degrees.

Dr. Afield also completed a neurological examination.  R. 178.  Langley-Guccione appeared anxious and depressed.  *Id.*  The doctor noted that she had tearful episodes during the interview.  *Id.* He also reported that her speech was normal; that she was oriented to person, place, and time; and that her remote and recent memory appear "fair."  *Id.*  She was able to recall "Presidents from Bush to Clinton" and able to perform "serial 3's" but not "serial 7's." She could recite three of seven numbers forward, but only three in reverse.  *Id.*  She could remember two of three objects after five minutes *Id.*  Dr. Afield noted that her cranial nerves were otherwise intact.  *Id.*

The same day, Dr. Afield also performed a neurobehavioral assessment, administering various tests over a twenty-four hour period.  R. 181.  Dr. Afield assessed post-traumatic stress disorder, and opined that "[m]oderate to severe levels of anxiety and tension make simple routine life tasks difficult for this patient."  R. 185.  Dr. Afield also assessed "significant depression," loss of efficiency, periods of confusion and inability to concentrate.  *Id.*  The tests showed that Langley-Guccione placed within the "average range" of general intellectual ability. *Id.*  Langley-Guccione read at the fourth grade level, spelling at the sixth grade level and performed arithmetic at the seventh grade level.  *Id.*  Dr. Afield

also noted that the test results showed "significant discrepancies . . . with evidence of cerebral dysfunctioning." *Id.*

Dr. Afield also performed computerized brain mapping on April 19, 2001. R. 186. The results revealed: brainstem auditory evoked potentials within normal limits (R. 187); visual event related evoked potentials with latencies within normal limits (R. 187); and auditory event related evoked potentials with abnormal results which can "certainly be seen in patients with closed head injury." (R. 188).

On May 8, 2001, Dr. Afield explained the test results to Langley-Guccione. R. 173. In his progress notes from that visit, Dr. Afield noted (without referring to specific findings or tests): "I think this is a permanent impairment. It is accident related. It is severe and it is substantive." *Id.* He also states that Langley-Guccione has chronic pain and "some" brain damage. *Id.* He also expressed concern that she was struggling in school, and that her grade point average dropped from a 4.0 to 2.8." *Id.* In a letter to Dr. Prusinski dated ths same day, Dr. Afield expressed similar concerns, and also states:

> I think we should downplay the situation with this lady and encourage her to go on to school. She does have brain impairments and will need to cover that up if she wants to finish. I have my doubts as to whether she will, but again, I do not think that we ought to share that with her. I have encouraged her to continued on with you and I think it is appropriate to continue with antidepressants. Ultimately, she will probably have to be in psychotherapy.

R. 172.

On June 25, 2001, Langley-Guccione filed her claim for childhood disability and SSI benefits, claiming disability as of the date of her car accident due to brain damage, depression, memory loss, headaches, loss of balance, and back and neck pain. R. 65-67, 106, 271-73. In forms for the Office

of Disability Determinations from August 2001, Langley-Guccione stated that she was not taking prescription medication, but was seeking physical therapy (massages) for pain.  R. 90, 92.  She complained that her back, wrists, and hands hurt after doing yard work.  R. 92.  She also complained that she found it "hard" to drive when she had headaches or when her eyes began to bother her.  *Id.* In a work history report, Langley-Guccione described her employment duties as a restaurant worker in a pizzeria.  R. 94.  She answered phones, helped customers, made pizzas, cut and took pizzas out of the oven, and set up and cleaned up the pizzeria.  *Id.*  She lifted and carried pizza boxes, pizzas, and empty boxes.  *Id.*  The heaviest weight she lifted in the job was twenty pounds, and she frequently lifted ten pounds.  *Id.*

On October 8, 2001, Dr. John Spencer C. Archinihu performed a consultative examination. Dr. Archinihu opined that Langley-Guccione "may have" limitations with employment that requires heavy lifting, prolonged standing or sitting, or repetitive wrist movements.  R. 198.  He also limited Langley-Guccione from work that requires lifting overhead or overhead work, and further opined that she "may" have limitations with her cognitive memory skills, stating that a "specialist can better evaluate this."  *Id.*  Otherwise, Dr. Archinihu's physical examination revealed that Langley-Guccione was mainly normal.  R. 194-95.  He noted that Langley-Guccione was alert, had normal gait, and mounted the examination table by herself.  R. 194.  Her head, neck, back, and extremities were mainly normal.  R. 195.  The range of motion and grip strength in her upper and lower extremities were functional and normal.  *Id.*  Dr. Archinihu did note sub-occipital paraspinal muscle tenderness and tenseness in the neck, and some positive thoracic bony and some paraspinal muscle tenderness tenderness.  *Id.*  Langley-Guccione also displayed positive Tinel's and Phelen's signs (carpal tunnel

syndrome) to the wrists bilaterally.  *Id.*  Dr. Archinihu also noted that Langley-Guccione had some difficulty recalling the details of her past medical history.  R. 194.

Dr. Scott M. Kaplan performed a psychological consultative examination performed by Dr. Scott M. Kaplan on October 11, 2001.  R. 199.  He diagnosed Adjustment Disorder with Depression and Chronic Pain.  R. 200.  Langley-Guccione's mood and affect were mildly depressed.  *Id.*  Her concentration, memory, short-term memory functioning, and task persistence were variable, and according to Dr. Kaplan, stemmed from her Adjustment Disoder and Chronic Pain Syndrome.  R. 200-01.  Test results also indicated impaired visual tracking, visual scanning, speed of mental operations, cognitive shifting and mental flexibility.  R. 201.  Dr. Kaplan noted that all of these cognitive deficiencies were due to Langley-Guccione's Adjustment Disorder and Chronic Pain Syndrome, as well as the fact that she did not appear to put forth full effort on the tests.  *Id.*  Dr. Kaplan opined that Langley-Guccione is capable of "age appropriate" daily living activities, and that her social functioning was normal.  He opined that she was of capable of gainful activity, and should not experience "significant deterioration in a work-like setting."  *Id.*

Two state agency physicians expressed opinions on Langley-Guccione's physical RFC.  R. 222, 230.  On November 8, 2001, the first state agency physician opined that Langley-Guccione was capable of light work activity – lifting and carrying twenty pounds occasionally and ten pounds frequently; standing, walking, sitting for six hours during an eight-hour workday; and pushing and pulling without restriction.  R. 223.  The physician opined that Langley-Guccione had no postural, manipulative, visual, communicative, or environmental limitations.  R. 224-26.  On April 17, 2002, the second state agency physician expressed substantially the same opinions as the first physician,

except that the second physician opined that Langley-Guccione had occasional postural limitations in climbing, balancing, and crouching due to neck and back pains.  R. 232.

On May 15, 2002, a state agency psychologist assessed Langley-Guccione's mental RFC.  R. 238.  The psychologist opined that Langley-Guccione's mental activities were mostly not significantly limited, except that Langley-Guccione was "moderately limited" in her abilities to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, and respond appropriately to changes in the work-setting.  R. 238-39. In addition, the psychologist stated the Langley-Guccione was moderately limited in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  R. 239.  The psychologist noted that her limitations were due to an affective disorder.  R. 246.  Also, Langley-Guccione's functional limitations in terms of restrictions of daily living activities and difficulties in maintaining social functioning were "mild."  R. 253.  Her limitations in maintaining concentration, persistence, or pace were "moderate," and the psychologist noted one or two episodes of decompensation.  *Id.*

On August 19, 2002, psychologist Fred J. Petrilla, Ph.D., performed a neuropsychological evaluation.  R. 262.  Dr. Petrilla administered the Wechsler Adult Intelligence Scale-III (WAIS-III) which showed Langley-Guccione was functioning within the Low Average Intelligence Classification, and more specifically, was functioning at the fourteenth percentile of her standardized age group.  R. 262-263.   Langley-Guccione's score on the Halstead-Reitan Impairment index was .9, which, according to Dr. Petrilla's notes, indicated functioning within the severely impaired range of

neuropsychological functioning and suggested brain injury. R. 263. Langley-Guccione's score on the Reitan Neuropsychological Deficit Scale (NDS) was within the Moderately Neuropsychological Impairment Range, and also implied the presence of brain injury. *Id.* Dr. Petrilla noted that test results also showed weaknesses in verbal memory, general memory, attention-concentration, delayed recall, visual tracking and speed of mental operation skills. *Id.*

Dr. Petrilla also assessed Langley-Guccione's "depressive symptoms": dysphoria, pessimism, self-depreciation, guilt, lack of energy, crying, psychomotor retardation, irritability, agitation, tenseness, prone to worry, lack of self-confidence, feeling of uselessness, worthlessness and hopelessness, being withdrawn and introverted, and withdrawal from activities previously enjoyed. R. 264. He also stated that she would have "great" difficulty in making simple decisions. *Id.* He also opined that Langley-Guccione would have a "great deal of difficulty in a competitive work situation, especially where production is expected with a specified time limit." R. 266. Dr. Petrilla diagnosed Cognitive Disorder, Major Depressive Disorder, a severe level of stress, and a Global Assessment Functioning (GAF) score of 43, indicating a serious impairment in functioning. R. 265. Dr. Petrilla concludes that Langley-Guccione's "neuropsychological dysfunctioning and resultant emotional problems will interfere with her social and/or occupational functioning." R. 266.

Langley-Guccione sought psychotherapy treatment with Dr. Petrilla. R. 258-261. According to Dr. Petrilla's notes dated January 16, 2003 and March 20, 2003, Dr. Petrilla noted that Langley-Guccione "exhibited difficulty in thinking of words to described and express her thoughts," (R. 258) and that she seemed to "grasp for words." (R. 261). Langley-Guccione exhibited problems with attention span, concentration span, and recent memory. R. 258, 260. Dr. Petrilla also reported that

-34-

she appeared irritable, tense, agitated, aggravated, anxious, physically exhausted, to be "in chronic pain," and "clinically depressed."  R. 258.  Dr. Petrilla again noted similar findings on August 22, 2003.  R. 280-81.

On September 29, 2003, Dr. Petrilla completed an "Ability to Do Work-Related Activities (Mental)" form detailing Langley-Guccione's mental limitations. R. 282-83.  Dr. Petrilla opined that Langley-Guccione possessed "no useful ability to function" in the following areas: maintain attention for a two hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions form psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting and deal with normal work stress. R. 282.  Dr. Petrilla opined that Langley-Guccione's mental impairments would, on average, cause her to be absent from work more than four days per month. R. 283.  He assessed "severe" clinical depression, and "markedly impaired" memory and concentration.  *Id.*  Dr. Petrilla concluded that overall, Langley-Guccione was "not capable of gainful employment." *Id.*

On September 30, 2003, Langley-Guccione testified at the hearing before the ALJ. R. 33.  She complained of "really bad" headaches and back, neck, wrist, and arm pain, but stated that she was not receiving treatment for her physical problems. R. 35-36.  She testified that she was not on any

medication, except Tylenol, which did not always help with the pain. R. 36-37. She reported seeing Dr. Petrilla for psychological therapy approximately once every month or two months. *Id.* She also reported having problems with memory, but testified that she did not know how to describe how it affects her. R. 37. She also testified that she gets along with people "okay," and that her "biggest problem" was not being able to do the activities she used to do before the accident. R. 37-38.

Langley-Guccione described her typical day as doing "some" housework, cooking, and cleaning with the help of her husband. R. 39. She drives a car occasionally (to take her children to doctor's appointments), goes to grocery store with her husband, watches television, and listens to music in the car. R. 39-40. When asked whether she could perform the pizzeria job now, she responded that she did not know, but that she had to stand for a long period of time at the pizza place and that standing causes her pain now. R. 42. She also stated that she did not know whether she could get along with "people and supervisors" because she does not really talk to anyone. *Id.* According to her testimony, she cannot lift her son, but did not know his weight. R. 43. She could lift a gallon of milk, weighing eight and a half pounds. *Id.* She could stand for "maybe" ten minutes, and could walk for "maybe" less than ten minutes. *Id.* She also testified that she was married in September 2000. R. 44.

On February 18, 2004, Dr. Homi Cooper performed physical consultative examination. He diagnosed: severe short-term memory loss, depression, a history of blurry vision and headaches, and chronic pain. R. 295. He opined that Langley-Guccione would have "significant difficulties with work-related mental activities including memory, understanding, sustained concentration, persistence, social interaction and any adaption to change in a productive workplace." R 296. He also stated that

Langley-Guccione would have "significant" communicative limitations because of her short-term memory loss and depression. *Id.* In his report, Dr. Cooper found that Langley-Guccione would have "no significant physical limitations," and found no postural, manipulative, or "relevant" visual or environmental limitations. *Id. S*he could stand, walk, and sit for six hours during an eight-hour work day, although her "fidgetiness would prevent her from [sitting] for more than a few minutes at a time." *Id.* He stated that she could lift and carry five to ten pounds on a repetitive basis and up to fifteen to twenty pounds on an occasional basis. *Id.*

The same day, Dr. Cooper also completed a medical source statement checklist stating slightly different opinions from those in his report. R. 297-99. He opined that Langley-Guccione could lift and carry twenty or twenty-five pounds occasionally, less than ten pounds frequently. R. 297. He stated that standing and sitting would not be affected by her impairment, but did not check the box to state that Langley-Guccione could stand or sit for six hours in an eight-hour work day. R. 297-98. Regarding Langley-Guccione's ability to sit, the doctor noted "is fidgety and cannot concentrate to sit for any length of time." R. 298. Dr. Cooper also stated that the medical findings that supported his opinions were that Langley-Guccione "has significant short term memory loss and depression." *Id.* Finally, Dr. Cooper also stated that Langley-Guccione would have occasional postural limitations (in climbing, balancing, kneeling, crouching, crawling, and stooping) and "limited" speaking limitations. R. 298-99. He again, pointed to Lnagley-Guccione's short-term memory loss and depression as support for his conclusions. R. 299.

On February 19, 2004, Barbara Paulillo, a psychologist, examined Langley-Guccione for a psychological consultative examination. R. 284. Dr. Paulillo diagnosed Major Depressive Disorder,

Avoidant Personality Disorder, and "[p]roblems with environmental stressors, financial difficulties (sic)." R. 289.  Dr. Paulillo noted that Langley-Guccione had memory difficulties and problems with concentration.  She specifically noted that Langley-Guccione had problems with her "immediate memory," but that Langley-Guccione appeared to be of "average" intelligence.  R. 287.  Langley-Guccione's test results also indicated difficulty concentrating, although, Dr. Paulillo also reported that the test results are likely "invalid with an increased probability of serious psychological and emotional problems" as the results also showed "some motivation to overreport (sic) psychopathology." *Id.*  Dr. Paulillo also noted that Langley-Guccione was exaggerating her memory impairment.  *Id.*  She also reported that Langley-Guccione "may be unable to complete tasks in a timely manner as evidenced by her slow comprehension of questions," and that Langley-Guccione appeared to have difficulty in following simple instructions and was easily distracted.  R. 289.  Dr. Paulillo concluded that Langley-Guccione's "prognosis is fair." *Id.*

On April 27, 2004, the ALJ issued a decision that Langley-Guccione was not disabled and not entitled to benefits.  R. 25.  On June 1, 2004, Dr. Petrilla saw Langley-Guccione for a therapy session and reported observations and findings similar to those stated in Dr. Petrilla's previous notes.  R. 317.

## B.    THE ANALYSIS

Langley-Guccione contends that the ALJ erred for three reasons: 1.) the ALJ did not show good cause for assigning "little weight" to the opinion of treating physician Dr. Petrilla (Docket No. 9 at 12); 2.) the ALJ did not adequately address whether Langley-Guccione's mental limitations eroded her capacity to perform unskilled work (*id.* at 15); and 3.) the ALJ failed to state with

-38-

particularity the weight given to Dr. Afield's opinion, and further, did not correctly consider the opinion in its entirety (*id.* at 17-18).[4]

    1.    <u>The ALJ's Consideration of the Opinions of Dr. Petrilla and Dr. Afield</u>

Langley-Guccione first argues that the ALJ did not show "good cause" for rejecting the opinion of treating physician Dr. Petrilla.  More specifically, Langley-Guccione claims that the ALJ should have given Dr. Petrilla's opinion substantial weight because Dr. Petrilla performed significant objective testing, treated Langley-Guccione over a considerable period of time, and because his opinion is supported by other evidence in the record.  Docket No. 9 at 12-14.  The Commissioner counters that Dr. Petrilla's opinion concerns issues reserved for the Commissioner (and are therefore not entitled to controlling weight), and that substantial evidence supports the ALJ's decision to discount Dr. Petrilla's opinion.  Docket No. 10-1 at 6.  The Commissioner is incorrect.  Substantial evidence in the record does not support the ALJ's rejection of the treating physician's opinion.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis, and medical evidence of a treating physician.  The ALJ found that Langley-Guccione's mental condition of "major depression" and "chronic pain disorder" eroded Langley-Guccione's occupational base, but concluded that despite her mental limitations, Langley-Guccione could perform the "simple repetitive tasks associated with unskilled work." R. 24.  The ALJ included no limitations for Langley-Guccione's mental conditions, other than stating that Langley-Guccione could perform these simple repetitive tasks for unskilled work. *See id.*

---

[4]As Langley-Guccione's first and third issues both allege error because the ALJ did not properly weigh medical source opinions, the Court addresses both as the first issue of whether the ALJ properly weighed the opinions of Dr. Petrilla and Dr. Afield.

In assessing Langley-Guccione's mental ability to function, the ALJ states that he gave little weight to Dr. Petrilla's opinion that Langley-Guccione had "no useful ability to function" (as a result of her mental condition) because the ALJ found it inconsistent with the "diagnostic and clinical findings in the record as well as the opinions of other mental health professionals in the record." *Id.* The ALJ principally relies on Dr. Kaplan and Dr. Paulillo's opinions to contradict Dr. Petrilla's opinion, and also briefly notes that Langley-Guccione's daily activities support his rejection of Dr. Petrilla's opinion. *Id.*

First, the ALJ purported to reject Dr. Petrilla's opinions based on "diagnostic and clinical findings in the record," but essentially relies only on portions of two medical source statements from Dr. Kaplan and Dr. Paulillo, neither of whom were treating physicians.  The only activities of daily living the ALJ cites (as examples of how Langley-Guccione's mental condition imposes only "mild" restrictions) are that Langley-Guccione cares for her children, drives, and attends church.  R. 24. These examples fail to contradict (and the ALJ never explains why they contradict) Dr. Petrilla's opinions and findings that, *inter alia,* Langley-Guccione would have great difficulty making simple decisions (R. 264); has exhibited problems with attention span, concentration span, and recent memory (R. 261); complete a normal workday or workweek without interruption (R.282); accept instructions and respond appropriately to supervisors (*id.)*; and get along with co-workers without distracting them (*id.)*.  Further, the medical opinions and findings the ALJ cites do not, when viewed in their entirety, support discounting Dr. Petrilla's opinions. Dr. Paulillo diagnosed Langley-Guccione with Major Depressive Disorder and Avoidant Personality Disorder, and noted that Langley-Guccione appeared to have difficulty following simple instructions and was easily distracted.  R. 289.  Dr.

Paulillo also opined that Langley-Guccione "may be unable to complete tasks in a timely manner." *Id.* Similarly, Dr. Kaplan stated that Langley-Guccione had variable concentration, memory (including short-term memory functioning), and task persistence as a result of her Adjustment Disorder and Chronic Pain Syndrome. R. 201. Dr. Kaplan's test results also indicated impaired visual tracking, visual scanning, speed of mental operations, cognitive shifting, and mental flexibility. *Id.*

Further, the ALJ made no finding that Dr. Petrilla's opinion was wholly conclusory, and his decision to discount Dr. Petrilla's opinion is not supported by substantial evidence in the record. Many of the other medical sources in the record find mental limitations that could affect Langley-Guccione's ability to work. As stated earlier, Dr. Kaplan and Dr. Paulillo note specific mental limitations not considered by the ALJ. In addition, Dr. Afield assessed post-traumatic stress disorder, and opined that "[m]oderate to severe levels of anxiety and tension make simple routine life tasks difficult for [Langley-Guccione]." R. 185. He also assessed "significant" depression, loss of efficiency, periods of confusion, and an inability to concentrate. *Id.*

The state agency psychologist opined that because of Langley-Guccione's affective disorder, she was "moderately limited" in her abilities to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; and respond appropriately to changes in the work-setting. R. 238-39. Dr. Cooper (who diagnosed "severe" short-term memory loss, depression, and chronic pain) opined that Langley-Guccione would

have "significant difficulties with work-related mental activities including memory, understanding, sustained concentration, persistence, social interaction and any adaption to change in a productive workplace."   R 295-96.   He also stated that Langley-Guccione would have "significant" communicative limitations because of her short-term memory loss and depression.[5]   *Id.* Thus, substantial evidence does not support the ALJ's rejection of Dr. Petrilla's opinions.[6]

Next, Langley-Guccione argues that the ALJ did not weigh Dr. Afield's opinion, and did not consider the entirety of Dr. Afield's opinion. Docket No. 9 at 17.  The Commissioner briefly responds that Dr. Afield's findings and opinion do not support Dr. Petrilla's opinion, and do not indicate that Langley-Guccione was unable to perform unskilled work. Docket No. 10-1 at 11.  The Commissioner also argues that the ALJ is not required to refer to every piece of evidence in his decision.  Langley-Guccione is correct.  The ALJ is required to state with particularity the weight given different medical opinions and the reasons therefore.  As stated, Dr. Afield completed a neurological evaluation of Langley-Guccione and noted mental limitations based on Langley-Guccione's post-traumatic stress disorder and depression.  In his decision, the ALJ briefly summarized Dr. Afield's opinions and findings (without mentioning these mental limitations). R. 20-21.  The ALJ never states the weight

---

[5] The ALJ accorded "great weight" because to Dr. Cooper's opinion because was it was the "most recent, comprehensive, and up-to-date assessment of the claimant's overall condition and work-related activities."  R. 23.

[6] The Commissioner argues that Dr. Petrilla's opinion is the ALJ's ultimate decision, and therefore should not be afforded controlling weight.  The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled, but the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  The Commissioner is incorrect.  Dr. Petrilla opined as to a myriad of issues not reserved for the Commissioner, and in addition, as argued below, the ALJ's decision to assign little weight to Dr. Petrilla's opinion is not supported by substantial evidence in the record.

he assigned to Dr. Afield's opinion, and never mentions (aside from the brief summary), evaluates, or considers Dr. Afield's opinions and findings. *See* R. 20-26. Langley-Guccione thus correctly argues that the ALJ's errors in evaluating the opinions of Dr. Petrilla and Dr. Afield warrant remand.

2.   Langley-Guccione's Mental RFC to Perform Unskilled Work

Langley-Guccione also contends that the ALJ erred in finding that Langley-Guccione could perform the mental requirements of unskilled work. She specifically argues that the ALJ did not properly apply the facts of this case to the mental requirements of unskilled work, as outlined in the relevant Social Security Rulings ("SSR's"). Docket No. 9 at 15. The Commissioner argues that substantial evidence supports the ALJ's finding that Langley-Guccione had the mental RFC to perform simple, repetitive tasks associated with unskilled work, and more specifically, that the ALJ is not required to cite specific SSR's in a decision. Docket No. 10-1 at 14-15. Basically, the Commissioner contends that the ALJ used the term "unskilled work" as described in the relevant regulations and rulings, and that substantial evidence supports the ALJ's finding that Langley-Guccione could perform unskilled work.

While the Commissioner is correct that the ALJ is not required to cite specific SSR's in a decision, the Court agrees with Langley-Guccione that the Commissioner erred in finding that Langley-Guccione could perform the mental requirements of unskilled work. Social Security Ruling 85-15 states:

> [t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

-43-

SSR 85-15. The ALJ found that Langley-Guccione's mental conditions did not preclude her from doing light unskilled work, and that she could perform her past work at the pizzeria (as her past work duties involved light unskilled work). The ALJ essentially equated the mental requirements of unskilled work with the ability to do simple, repetitive tasks. R. 24. Other than stating that Langley-Guccione's mental condition limits her to "simple repetitive tasks associated with unskilled work," the ALJ does not delineate any specific mental limitations in his findings. *See* R. 25-26. As stated earlier, the ALJ incorrectly rejected Dr. Petrilla's opinions that contradict the ALJ's conclusion that Langley-Guccione's mental condition limited her ability to work. Also, as detailed earlier, numerous medical sources noted that Langley-Guccione had limitations due to her mental condition. Substantial evidence does not support the ALJ's conclusion that Langley-Guccione could perform the mental demands of unskilled work.

## VI. <u>CONCLUSION</u>

This case is therefore **REMANDED** to the Commissioner pursuant to Sentence Four to allow the Commissioner to reevaluate the evidence, to explain the basis for her decision, and to hold such further proceedings as she may be advised. The Clerk shall enter judgment in favor of Plaintiff and close the case.

**DONE AND ORDERED** this 2nd day of March, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

-44-

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Albert D. Tutera
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817